```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
SHA-HEED RAHMAN,                         :
                    Plaintiff,           :
                                         :
          -v-                            :    08 Civ. 4368 (DLC)
                                         :
OFFICER ACEVEDO, OFFICER TEJEDA, OFFICER :    OPINION AND ORDER
MAYFIELD, SERGEANT MENDEZ, OFFICER       :
DAWKINS, OFFICER LASHLEY, OFFICER MILLS, :
OFFICER SMITH, SERGEANT PAUTLER, HEARING :
OFFICER CALERO, and DIRECTOR OF SPECIAL  :
HOUSING VENETTOZZI, in their individual  :
capacities,                              :
                    Defendants.          :
                                         :
-----------------------------------------X
```

APPEARANCES:

For plaintiff:
Michael W. Martin
James A. Cohen
Fordham Law Clinic
33 West 60th Street, 3rd Floor
New York, NY 10023

For defendant:
Mary Y.J. Kim
New York State Office of the Attorney General
120 Broadway, 24th Floor
New York, NY 10271

DENISE COTE, District Judge:

Plaintiff Sha-heed Rahman ("Rahman") asserts claims of excessive use of force under the Eight Amendment, failure to intervene under the Eighth Amendment, violation of due process under the Fourteenth Amendment, and retaliation under the First Amendment against various employees of the New York State

Department of Corrections and Community Supervision ("DOCCS").
On August 8, 2011, defendants Officer Dyeisha Smith ("Smith"),
Sergeant James Pautler ("Pautler"), Hearing Officer Ana Calero
("Calero"), and Director of Special Housing Donald Venettozzi
("Venettozzi," and collectively, the "Moving Defendants") filed
a motion for summary judgment on the Eighth Amendment, First
Amendment and Fourteenth Amendment claims asserted against them.
For the following reasons, their motion is granted.


BACKGROUND

        The following facts are undisputed unless otherwise
indicated.  During the relevant period, Rahman was an inmate
incarcerated at the DOCCS's Sing Sing Correctional Facility
("Sing Sing"), serving an indeterminate sentence of 25 years to
life.  He is a Shiite Muslim.  Calero was a hearing officer who
conducted disciplinary hearings at Sing Sing.  Venettozzi was
Acting Director of Special Housing who reviewed and affirmed
disciplinary hearing dispositions.  Smith was a corrections
officer employed at Sing Sing.  Pautler was a corrections
sergeant at Sing Sing.

I.   June 4, 2007 Incident

        Underlying all of Rahman's claims is an incident that took
place on June 4, 2007.  Rahman alleges that on that date, he
entered the mess hall at Sing Sing and noticed that a

corrections officer was serving food.  Upon seeing this, Rahman spoke to a cook and told him that he understood officers were not supposed to handle food.  This issue was not new to Rahman; he had previously filed a grievance about officers handling food as he had been concerned about contamination of the food in violation of his religious dietary restrictions.  Officer Tejeda ("Tejeda") overheard this conversation and called Rahman a snitch.  When Rahman's table was called to return to their cells, Tejeda intercepted him at the pat-frisk area.  After conducting a search of Rahman, Tejeda and Officer Acevedo ("Acevedo") escorted him towards his cell separately from the other inmates.  They crossed the mess hall bridge to the S & X Landing, then descended one flight of stairs to the R & W Landing, which itself was one flight above the Q & V flats, where Rahman's cell was located.  On the R & W Landing, Tejeda punched Rahman in the face, and Acevedo hit him on the back of the head with a baton.  Rahman started to fight back, biting Tejeda in the chest.  One of the officers pulled the alert pin on his radio, signaling more corrections officers -- Dawkins, Mayfield and Lashley -- to arrive at the R & W Landing.  Rahman also bit Lashley in the chest.  Together, the five officers continued to beat Rahman until he was on the floor and handcuffed.  More officers arrived at the R & W landing.  Some of the defendants, including Officer Mendez ("Mendez"),

3

continued to beat Rahman after he was handcuffed.  A group of inmates on the level with the Q & V flats observed the fight.

The Inmate Misbehavior Report ("IMR") filed by Tejeda presents a different version of the events that took place on June 4, 2007.  Tejeda alleged that when Rahman noticed a corrections officer serving food in the mess hall, he began screaming "put on a hairnet," and continued to yell this even after sitting at a table with his meal.  Towards the end of the meal period, Tejeda proceeded to the mess hall bridge to assist with the pat and frisks.  When Rahman approached the bridge, he continued to scream "wear a fucking hairnet."  Tejeda therefore pulled Rahman to the side of the line and began to escort him separately from the other inmates back to his cell.  While on the R & W landing, Rahman punched Tejeda in the face and bit his chest.  After Tejeda pried Rahman off of him, Rahman bit Lashely in the chest, and Tejeda responded by hitting him with his baton on the back and legs.  He was then able to pin Rahman to the ground and handcuff him.  A use of force report filed by Mendez added that several officers were needed to get Rahman under control and that in so doing, they hit him with their batons on his back and legs and had to use force on his head, arms, upper body and right wrist.

For the purposes of this motion a few more undisputed facts are relevant.  On June 4, 2007, Smith was the Officer in Charge

("OIC") on the mess hall bridge.  As the OIC, her duties were to remain on the bridge, call down inmates from their cells to the mess hall and count the number of inmates entering and exiting the mess hall.  As the OIC, she is not supposed to respond to incidents that arise, nor do officers that respond to incidents report to her.  As some of the inmates were leaving the mess hall that day, Smith heard a commotion from the levels below the mess hall bridge, where she could not see.  She could not tell what was going on, but simply heard yelling.  An alert also came in over the radio.  Smith then locked the gates of the mess hall in order to help secure the area.  Smith was on the mess hall bridge during the entire relevant period.[1]  She was not asked to leave her post by Tejeda.  Smith testified that she was not aware prior to the incident that Tejeda or any other officer intended to assault Rahman.

II.  Rahman's Disciplinary Hearing

As a result of the June 4, 2007 incident, Rahman was charged with refusing a direct order, assault on staff, violent conduct, and creating a disturbance.  Rahman pled not guilty to

---

[1]     Although Rahman testified that he did not believe he would have been assaulted had Smith been at her post, he does not actually testify that she was not at her post, that he saw her leave her post, or that there is any other evidence that she left her post.  His testimony, rather, is simply a statement of his belief that she would have prevented his assault.

all counts.  Calero conducted Rahman's Tier III Hearing over six days in June and July 2007.

At Rahman's request, Calero heard the testimony of inmates named Williams and Muhammed, a civilian cook, Acevedo, Dawkins, and an officer named Hudson.  Rahman, Tejeda, and Lashley also testified.  Calero denied Rahman's requests to take testimony from an unnamed Sergeant, corrections officers Benjamin, Smith, Pautler and an inmate named Hansberry.  On the Witness Interview Notice denying Rahman's request that Hansberry testify at the hearing, Calero noted that his testimony would be irrelevant. Calero testified that she believed that Hansberry was "one or more" levels below the level where Rahman alleged his beating took place, and that therefore could not have witnessed anything.  On the Witness Interview Notice, Calero wrote that Hansberry was on Q & V level "one tier below R/W" where the alleged beating took place.[2]

Calero found Rahman guilty of refusing a direct order, assault on staff, and violent conduct, and found Rahman not guilty of creating a disturbance.  Referenced as support for Calero's hearing disposition report dated July 3, 2007, ("Disposition"), were the witnesses' and Rahman's testimony, a

---

[2]     Photographs taken in 2010 show that the R & W landing, where the assault allegedly took place, was partially visible from the Q & V cage, the stairwell area connecting floors Q and V.

visit to the locations discussed in the hearing, the IMR, and the employee and inmate injury reports.  In the Disposition, Calero concluded that Rahman "was blinded by rage, which refutes his uncorroborated claim of justification."  Calero denies that she had prejudged the outcome of the Disposition, that she considered testimony from Hansberry's own disciplinary hearing, or that she relied solely on the IMR.  The penalty imposed on Rahman included 22 months of detainment in the Special Housing Unit for solitary confinement ("SHU").

Rahman appealed the Disposition.  Venettozzi affirmed the Disposition on September 7, 2007.  After reviewing the hearing for procedural errors, Venettozzi found none that warranted a reversal or rehearing.

III. State Court Proceedings

Rahman, proceeding pro se, filed an Article 78 petition in the New York State Supreme Court, challenging the Disposition. The petition was dismissed, and Rahman appealed to the Appellate Division, Second Department.  On appeal, Rahman was represented by an attorney, James M. Bogin of Prisoner's Legal Services of New York.  On Rahman's behalf, Mr. Bogin filed both a petitioner's brief and a reply brief.  In his briefs on appeal, Rahman argued that Calero had violated his "constitutional and regulatory right to present relevant witnesses at his hearing by denying [his] request to present inmate Hansberry as a witness."

Rahman cited Supreme Court case law concerning Fourteenth Amendment due process rights.  The briefs do not indicate that Rahman had any difficulty in presenting his arguments due to gaps in the hearing transcripts or missing tapes that were to be presented before either the Supreme Court or the Appellate Division.

The Appellate Division affirmed the dismissal of the Article 78 petition, holding that

> [t]here is no support for the petitioner's claim that he was denied his right to call a witness on his behalf.  The proposed witness would have presented testimony that was redundant in light of the testimony of other witnesses.  Moreover, the record reflects that the petitioner was afforded a full and fair opportunity to defend against the charges and to participate in the hearing.

Rahman v. Fischer, 873 N.Y.S.2d 654, 654 (2d Dep't 2009).


PROCEDURAL HISTORY

Rahman, initially proceeding pro se, filed this action on May 9, 2008.  On April 10, 2009, the motion by six supervisory defendants to dismiss the claims against them was granted, but Rahman was granted leave to replead his § 1983 excessive force claim against them.  Rahman v. Fisher, 607 F. Supp. 2d 580 (S.D.N.Y. 2009).  Rahman amended his complaint on May 22.

On August 11, the case was referred to Magistrate Judge Frank Maas for general pretrial purposes.  On August 12,

Magistrate Judge Maas approved Rahman's application for the appointment of pro bono counsel, requested that the Court's Pro Se Office locate such counsel, and informed Rahman that the request did not guarantee that pro bono counsel would agree to appear on his behalf.

The supervisory defendants filed a new motion to dismiss the claims against them on September 16.  This motion was granted on March 22, 2010.  Rahman v. Fisher, No. 08 Civ. 4368 (DLC), 2010 WL 1063835 (S.D.N.Y. Mar. 22, 2010).

On April 13, 2010, pro bono counsel filed an appearance on behalf of Rahman.  A third amended complaint was filed on June 3.  The parties thereafter engaged in discovery.  The Moving Defendants' motion was filed on August 8, 2011 and fully submitted October 28.

DISCUSSION

I.   Summary Judgment Standard

A motion for summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); see El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010).  The moving party bears the burden of demonstrating the absence of a material factual question, and in

making this determination, the court must view all facts in the light most favorable to the non-moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); El Sayed, 627 F.3d at 933. When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot "merely rest on the allegations or denials" contained in the pleadings.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  That is, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only disputes over material facts -- facts that might affect the outcome of the suit under the governing law -- will properly preclude the entry of summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).

The Moving Defendants move for summary judgment as to all the claims asserted against them in the third amended complaint. In his opposition, Rahman concedes to summary judgment on all claims filed against Pautler and to summary judgment on the First Amendment retaliation claim against Calero and Venettozzi. Furthermore, Rahman abandoned his First Amendment claim against Smith by failing to mention it in his opposition brief despite

it being addressed in the Moving Defendants' brief, thereby failing to present any specific facts showing that there is a genuine issue for trial.  Therefore, the only remaining claims contested in this motion are the Fourteenth Amendment claim against Calero and Venettozzi and the Eighth Amendment failure to intervene claim against Smith.

II.  Fourteenth Amendment Due Process Claim

    A.  The Denial of Rahman's Request to Present Hansberry's Testimony

Rahman argues that Calero's decision to deny his request to present the testimony of Hansberry violated his right to due process at his disciplinary hearing.  The Moving Defendants argue that Rahman is collaterally estopped from rearguing this issue as it has already been fully litigated and decided against Rahman in the state court Article 78 proceeding and appeal.

"Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action."  In re Hyman, 502 F.3d 61, 65 (2d Cir. 2007).  "[C]ollateral estoppel is a flexible doctrine and whether to apply it [in] a particular case depends on general notions of fairness involving a practical inquiry into the realities of the

litigation." [3]   Id. at 65-66 (citation omitted).  "The party
asserting issue preclusion bears the burden of showing that the
identical issue was previously decided, while the party against
whom the doctrine is asserted bears the burden of showing the
absence of a full and fair opportunity to litigate in the prior
proceeding."  Colon v. Coughlin, 58 F.3d 865, 869 (2d Cir.
1995).

Litigation of individual issues necessarily decided in an
Article 78 proceeding may be precluded by collateral estoppel in
subsequent actions.  Ruiz v. New York State Div. of Parole, 894
N.Y.S.2d 582, 583 (3d Dep't 2010).  But issues not raised in the
previous Article 78 proceeding cannot be barred by collateral
estoppel.  Colon, 58 F.3d at 870.

There is no dispute that Rahman challenged Calero's denial
of the admission of Hansberry's testimony at his Article 78
proceeding and his appeal of that proceeding.  Rahman briefed
the constitutional issue raised here, and the Appellate Division
specifically found that Calero was justified in her denial of
Hansberry's testimony.  Therefore, the Moving Defendants have
carried their burden of showing that this issue had been
previously decided in state court.

---

[3]     To determine whether a collateral estoppel applies to a New
York state court judgment, federal courts look to New York law.
In re Hyman, 502 F.3d at 65.

12

> Factors to be considered when determining whether
> there was a full and fair opportunity to litigate the
> issue in the prior action include the size of the
> claim, the forum of the prior litigation, the use of
> initiative, the extent of the litigation, the
> competence and experience of counsel, the availability
> of new evidence, indications of a compromise verdict,
> differences in the applicable law and foreseeability
> of future litigation.

King v. Fox, 418 F.3d 121, 130 (2d Cir. 2005) (citation

omitted).  Parties to a previous Article 78 proceeding generally

have had a full and fair opportunity to litigate the issues

raised in that proceeding.  See, e.g., DiSorbo v. Hoy, 343 F.3d

172, 183 (2d Cir. 2003).  Despite some question about the

preclusive effect of factual determinations in a prison hearing

reviewed by an Article 78 court, "where issues of law are

concerned," a plaintiff must "at least show that the alleged

deficiencies in his disciplinary proceedings produced some

significant effect on their review by the Appellate Division in

the Article 78 Proceeding."  Giakoumelos v. Coughlin, 88 F.3d

56, 60 (2d Cir. 1996).

   Rahman had a full and fair opportunity in state court to

litigate the issue of Calero's denial of Hansberry's testimony;

it was the chief issue he raised in his Article 78 proceeding.

Rahman had the opportunity to supplement the record of the

disciplinary hearing in state court, was assisted by counsel on

appeal and submitted detailed briefs that addressed the

constitutional issue he seeks to raise again in this action.

Rahman argues that deficiencies with the evidentiary record available in the Article 78 proceeding deprived him of a full and fair opportunity to litigate this issue.  He notes that portions of the disciplinary hearing transcript are either missing or that the hearing tapes were inaudible, an issue which cannot now be rectified because the audio tapes were "lost" by DOCCS.[4]  He also argues that the state courts did not have access to photographs of the relevant locations in Sing Sing, a memorandum written by Mendez, or a transcript of Hansberry's disciplinary hearing.

None of these alleged gaps in the evidence at the Article 78 proceeding deprived Rahman of a full and fair opportunity to litigate the issue that the Moving Defendants seek to collaterally estop.  Rahman does not suggest how any of the allegedly missing or inaudible transcript portions relate to Calero's decision to deny his request to present testimony from Hansberry, or how they might inform the state courts' review of that decision.  Even if Rahman had alleged that these transcript portions were relevant to the issue presented in the Article 78 proceeding, he cites to no case law that supports a finding that the degradation, loss, or unavailability of evidence is sufficient to deprive one of a full and fair opportunity to

---

[4]     Rahman provides no evidence that the hearing audio tapes were lost, and the Moving Defendants contend they have been preserved.

14

litigate an issue.  Indeed, at least in this particular
situation, such a principle would undermine the finality of any
decision by this Court, or any court to which Rahman would
present this issue in the future; if portions of the hearing
transcripts or audio tapes are permanently lost, Rahman would be
able to allege that in no court would he have a full and fair
opportunity to present his case, allowing him unlimited
opportunities to relitigate this issue in new fora.  See
Giakoumelos, 88 F.3d at 61 (finding collateral estoppel
especially apt because "[w]ere the district court to review the
merits of all of [plaintiff's] claims it appears that it would
have before it essentially the same record . . . that the
Appellate Division had before it.").

Although he does allege that the photographs, Mendez's
memorandum, and Hansberry's deposition transcript might have
informed the state courts' review of Calero's decision not to
hear Hansberry's testimony, he does not argue that he was
prevented from presenting this evidence in the Article 78
proceedings.  Id. at 60 n.2 (acknowledging that one can
supplement the evidence in an Article 78 proceeding); N.Y.
C.P.L.R. § 784(d)-(e), (h).  Rahman had a full and fair
opportunity to litigate the issue, including by presenting this
evidence to the state courts.  The fact that he chose not to
present this evidence at his Article 78 hearing "is beside the

15

point." Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003) (finding plaintiff had full and fair opportunity to litigate at prior proceeding even though he and his counsel chose to present limited evidence in support of his case). Having failed to carry his burden of demonstrating that he lacked a full and fair opportunity to litigate the issue of the admission of Hansberry's testimony before the state courts, Rahman is estopped from asserting this ground for his due process claim here.

   B.   Other Grounds for the Due Process Claim

   Aside from Calero's denial of his request to present Hansberry's testimony, Rahman makes an additional argument not raised in his Article 78 proceedings.  He contends that Calero and Venettozzi denied his due process rights by making and affirming a biased disposition.  First, he alleges that Calero's report in the Disposition of her visit to the incident location is belied by the evidence in the record.  Second, he argues that Calero's conviction that Hansberry was in the Q flats, not in the Q & V flats cage, as allegedly established by the record, further undermines Calero's credibility as an unbiased decisionmaker.  Third, Rahman alleges that the Disposition is at odds with the description of the injuries sustained by Rahman and Tejeda, and that this contradicts Calero's purported reliance on the injury reports.  The Moving Defendants suggest

that there is insufficient evidence to support Rahman's due process claims on these grounds.

"A prisoner may not properly be deprived of a cognizable liberty interest without due process of law." Gaston v. Coughlin, 249 F.3d 156, 163 (2d Cir. 2001). Therefore, "inmates retain due process rights in prison disciplinary hearings," including where such hearings "may lead to the loss of good time credit . . . or would subject an inmate to solitary confinement in the SHU." Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted).

"Inmates are entitled to," among other things, "a fair and impartial hearing officer." Id. But, "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989). In the context of prison disciplinary hearings, the Second Circuit has said that its "conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen." Patterson v. Coughlin, 905 F.2d 564, 570 (2d Cir. 1990). On the other hand, when a hearing officer states that he will not even consider evidence that a prisoner has introduced because he cannot believe that the prisoner's theory could be true, the hearing officer may be biased. Colon, 58

F.3d at 871.  The bare assertion of claims of bias or prejudgment should not preclude summary judgment merely because they implicate issues involving a hearing officer's state of mind.  Francis, 891 F.2d at 47.

Rahman has not shown any evidence that the Disposition was the result of bias.  There is no evidence that Calero had made up her mind about the case prior to the hearing or that she would not accept Rahman's evidence on the ground that she did not believe that his version of events could be true.  The Disposition includes a thorough summary of testimony and other supporting evidence that belie any attempt to characterize its author as biased.  What Rahman calls evidence of bias merely reflects his disagreement with Calero's view of the evidence presented at the disciplinary hearing.

The only component of Calero's site visit notes in the Disposition that Rahman appears to challenge is her notation that "[l]ooking up from Q gallery north to the middle of the landing on R & W north, the view is obstructed by the fence." Rahman submits as contradicting evidence photographs taken in September 2010 from the Q flats and Q & V cage showing some visibility into the R & W landing, although there is a fence surrounding the R & W landing, and therefore between that landing and the floor below.  These photographs cannot be construed as evidence that Calero's statement that she saw from

the Q gallery, in 2007, that the view of the R & W landing was "obstructed" by the fence was incorrect, much less that it was the product of bias.

Furthermore, the evidence shows that Calero's "conviction" that Hansberry was in the Q flats, not in the Q & V flats cage, was, at most, a miscommunication, as she testified at her deposition that Rahman's use of the words "first floor" during his hearing to describe Hansberry's location indicated to her that Hansberry was on Q floor proper and not in the Q & V flats cage, which is a stairwell connecting Q and V floors. While this might indicate that Calero was mistaken as to Hansberry's location, it is hardly evidence that she prejudged Rahman's case.

Finally, Rahman overemphasizes the discrepancies between the injury reports and the officers' testimony. Despite Rahman's characterization of Mendez's use of force report, his report does not state that Rahman was hit only in the legs, but instead notes that force was applied to Rahman's head, lower and upper back, legs, upper body, and wrist. Furthermore, Mendez's report specifically listed all the injuries to Rahman reflected in the report prepared by the nurse that examined him. Therefore, even had Calero relied solely on the reports and testimony from the defendant officers, these reflected the same injuries that Rahman himself alleges he suffered. On the other

hand, Rahman does correctly point out that Tejeda's injury report does not list any injury to his face, despite Tejeda's testimony that Rahman struck him there.  This one report might be sufficient for one to conclude that Tejeda received only a minor impact from Rahman's fist or that Rahman swung but failed to come into contact with Tejeda.  But it is not conclusive evidence that Rahman never swung at Tejeda.  Therefore, it is insufficient to conclude that Calero's acceptance of the officers' testimony that Rahman was the first to react physically was rooted in bias.[5]

III. Eighth Amendment Failure to Intervene Claim

Rahman brings a claim against Smith for failure to intervene in his alleged assault under the Eighth Amendment.  A law enforcement officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."  Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 129 (2d Cir. 1997) (citation omitted).  "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that

---

[5]     In his third amended complaint, Rahman also argues that Calero was biased because she spoke with witnesses outside the hearing, including the civilian cook, and withheld a use of force report that contradicted the testimony of certain defendants.  In his opposition brief, however, Rahman points to no evidence supporting these allegations that might defeat summary judgment on his due process claim.

excessive force is being used." Anderson v. Branen, 17 F.3d
552, 557 (2d Cir. 1994). "In order for liability to attach,
there must have been a realistic opportunity to intervene to
prevent the harm from occurring." Id.

There is no evidence that Smith was aware of any assault on
Rahman while it happened, nor that she was aware prior to the
assault that one might occur. Smith was assigned to be the OIC
of the mess hall, whose duties required her to remain on the
mess hall bridge. She testified that she was not told to leave
her post by Tejeda, and there is no evidence that she ever did
leave her post. Even Rahman himself did not testify that Smith
was not at her post. When the assault was occurring, Smith
heard a commotion from the levels below the mess hall, but she
could not see what was happening or discern what was happening
from the noise. Even if she had become aware of an altercation
between Rahman and correctional officers, there is no evidence
that she would have been able to determine from what she could
hear that the officers were employing excessive force rather
than appropriately restraining a disruptive inmate.

In the absence of any evidence supporting his contention
that Smith was aware of his assault and failed to intervene,
Rahman complains that during her deposition, Smith could not
remember various details about the day of the assault, such as
how many correctional officers or inmates were present in the

mess hall and how long the mess hall gates were locked.  Her

failure to recall these details does not contradict her

testimony that she was not aware of Rahman's assault at the time

it occurred.  Rahman having failed to set forth specific facts

showing that there is a genuine issue for trial, Smith is

entitled to summary judgment on this claim.


CONCLUSION

The Moving Defendants' October 28, 2011 motion for summary

judgment is granted.  Rahman's Fourteenth Amendment due process

claim and Eight Amendment failure to intervene claim are

dismissed in their entirety, and his First Amendment retaliation

claim is dismissed as to Smith, Pautler, Calero, and Venettozzi.

The Clerk of Court shall remove Smith, Pautler, Calero, and

Venettozzi as defendants from this case.


SO ORDERED:

Dated:    New York, New York
          December 5, 2011


                              _____
                                    DENISE COTE
                         United States District Judge